## Case No. 12,581.

SEAMAN et al. v. The CRESCENT CITY.

[1 Bond, 105.] [1]

District Court, S. D. Ohio. April Term. 1857.

COLLISION—PRESUMPTION OF FAULT—DAMAGES—SALE OF DAMAGED CARGO—LOSS—AFFREIGHTMENT.

1. In a case charging a collision by a steamboat on a flat-boat heavily laden, if there is doubt on the question of fault, by reason of a conflict in the evidence, the presumption of wrong will be against the steamboat.

2. After a cargo is shipped, the shippers can not demand it short of the port of destination without payment of full freight for the voyage.

3. In this case, the flat-boat was laden with flour in barrels, destined for New Orleans; as the result of the collision, the flour was submerged in water for several hours, and injured thereby; the master of the flat-boat, having repaired his boat, reshipped the flour on the same boat for New Orleans, where it arrived after a passage of three weeks, and was there sold at a great loss from its damaged condition; and as the collision occurred only sixty miles below Cincinnati, to which place the flour could readily have been shipped, and where it would have sold with little loss: *Held*, that the master of the flat-boat should have sent the flour to Cincinnati for sale, that being the nearest and best market; and that the owners of the steamboat, adjudged guilty of fault in the collision, are liable only for the actual loss that would have occurred, if the flour had been shipped to and sold at that place, and not for the loss sustained by the sale at New Orleans.

[This was a libel by Seaman and Gillespie against the steamboat Crescent City, to recover damages for a collision.]

Lincoln, Smith & Warnock, for libellants.

Charles Fox, for respondent.

OPINION OF THE COURT: The facts averred in the libel in this case may be summarily stated as follows: That on January 18, 1854, at Malta, on the Muskingum river. the libellants shipped on a barge or flat called the "Falls City No. 5," of which J. R. Bell was master and pilot. twelve hundred and ten barrels of flour, to be conveyed to New Orleans; that on the 20th of February, about two o'clock p. m.. at a place on the Ohio river, about two miles below Sugar creek, and about sixty miles below Cincinnati. and at the distance of about two hundred and fifty yards from the Kentucky shore, the river being broad, and without any obstruction to navigation, the steamboat Crescent City came up the river and made a landing on that shore, and took a wood-flat on its larboard side and thence came quartering out from shore. across the stern of the Falls City, and caused the flat in tow of said steamboat to strike the flour-barge on its larboard side, about twelve feet from the stern, tearing out the side from that point to the center of its stern, and causing it to sink so far that the cargo floated out into the river, and the flour was thereby greatly damaged by water; that most of the float-

1 [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

ing flour was caught and taken to New Orleans, and sold for the benefit of whom it might concern. The libellants allege that the loss on the sale of the damaged flour at New Orleans was $3,384.70, for which, with expenses amounting to $43.50, and interest from March 20, 1854, they claim a decree. The Crescent City having been attached at the port of Cincinnati, under process issued from this court, George Leslie intervened as the owner of the boat, and filed his answer, averring in substance that said boat, in coming up the Ohio river, crossed from the Indiana side to Powell's wood-yard, two miles below Sugar creek, on the Kentucky side, and there caused a wood-boat to be attached on either side of the steamboat, intending to take them in tow; and that while lying close to the shore, the stern aground, or nearly so, and the gunnel of the starboard wood-boat held fast by a tree, the steamboat being kept in that position by going forward with the larboard engine, and backing with the starboard engine, two flourbarges, lashed together, floated down within from one hundred to one hundred and fifty feet of the Kentucky shore; and by reason of the failure of the crew to lay the barges out into the river, the larboard side of the inner barge struck the wood-boat attached to the larboard side of the steamboat, thereby knocking a hole in its side, and causing the injury complained of by the libellants. The answer avers that the collision was not occasioned by any fault in the management of the steamboat, but wholly through the negligence and misconduct of the crews of the flat-boats.

These are the allegations of the parties presenting the points involved in this controversy. The case made by each is in direct conflict with that made by the other, and each, it is insisted. is sustained by the evidence. The duty. never pleasant, and not wholly free from difficulty, when the proofs are so seemingly contradictory and discrepant. is thrown upon the court of fixing on some satisfactory basis for a decree. There are fortunately some facts which are not controverted in the case. The collision happened between one and two o'clock in the afternoon of the 20th of February. 1854, in what is known as "Sugar Creek Bend," on the Kentucky side of the Ohio river, some two miles below the mouth of Sugar creek, and about sixty miles below Cincinnati. The river at the time was high. being. in the boatman's parlance, at an eighteen or twenty foot stage. The river is wide there, and the water, even close in to the Kentucky shore, of sufficient depth to float a steamboat of large size. Although there is a considerable bend in the river on that side, there is nothing to obstruct the view up and down for a distance of several miles. The weather. on the day named, was clear and calm. The current. at the place of collision, at the stage of water before stated, is about four miles and a half to the hour, setting in toward the Kentucky shore, and being strongest from two hundred to two hundred and fifty yards from that shore. These

facts warrant the inference that the collision in question could not have occurred without culpable negligence or want of skill in the management, either of the steamboat or the flour boat; and that one or both must be held responsible for the injury which resulted from it.

Before stating the views entertained by the court, upon the evidence adduced, it may be proper to remark, that in a controversy involving a collision between a steamboat and a flat-boat, so far as presumptions are allowable, they must be strongly against the former. A steamboat, especially one having side-wheels and powerful engines, as is the fact in relation to the Crescent City, has entire control of its movements, and, by the aid of its machinery, can change its direction or position with rapidity and ease, under ordinary circumstances. On the other hand, a flat-boat, heavily laden, being wholly dependent on the use of human strength and effort to effect a change in its direction or position, is moved slowly and with difficulty. The object of those having such a craft in charge, is to keep it in the strongest water, where its descent will be most rapid. It is obvious that a flat-boat can do little in avoidance of a collision; and that in competition with a steamboat, the latter will be held to stringent rules, in case of injury to the former. This, however, does not admit the conclusion that there may not be such negligence and want of skill in the navigation of a flat-boat, as to create a liability for an injury resulting from a collision. In stating the conclusions of the court, I do not regard it as necessary to present a critical analysis of the evidence offered by the parties. The right of the libellants to a decree in their favor depends wholly on the credit due to their witnesses. If the facts proved by them are credible, it is clear that no culpability attaches to the management of their flat-boat, and that the fault rests wholly on the steamboat. And the main fact in question relates to the position of the two boats, at the time of the collision. If, as the libellants allege, their boat was descending in the channel, at a proper distance from the shore, and the steamer, going forward, struck the flat, and thus caused the injury to the cargo, there can be no doubt as to which boat was in fault. The libellants have proved, by some seventeen or eighteen witnesses, the circumstances under which the collision happened. A number of these witnesses, including the master of the flat-boat which was injured, were employed on that boat at the time. and, as they state, saw the collision. Others were employed on the boat which was lashed to the injured flat, and had equally favorable opportunities of noticing the position and movements, both of the flat and the steamer. Several others were on another pair of flat-boats, some four or five hundred yards in advance of the one which was struck, but in clear view of the transaction. One witness was in a skiff, just above, but near the boats when they came together. Two witnesses were on a store-boat, between seven and eight hundred yards above the wood-yard at which the Crescent City took the wood-flats in tow, prior to the collision, who swear they saw the boats, and state distinctly their position and movements.

Without stating minutely the facts sworn to by each of these witnesses, it is sufficient to remark that there is a substantial agreement in their testimony as to the important facts relating to the collision. These facts may be comprehensively stated as follows: That the Crescent City, in its progress up the river, crossed over from the Indiana side and made a landing at a wood-yard on the opposite side. The steamer, having taken a wood-flat in tow on either side, after a detention of a few minutes, left the landing, and had proceeded upward some two or three hundred yards, the bow then quartering up stream, and at a distance of not less than two hundred yards from the shore, when the corner of the wood-flat on the larboard side of the steamboat struck the larboard side of the flour boat, which was next to the Kentucky shore, about twelve feet from its stern, carrying away the side of the flour boat from that point, including the stanchions, to the middle of the stern. As the result, the boat began immediately to sink, and a part of the flour, constituting its cargo, floated in the river. The crew of the flour boat succeeded in landing it a considerable distance below the place where the collision occurred. In relation to the distance from the Kentucky shore to the place of collision, the witnesses referred to vary somewhat in their testimony. None estimate it at less than one hundred yards, and much the larger number at from two hundred to two hundred and fifty yards. The mean of their estimates is about two hundred yards. In corroboration of their testimony as to this distance, several of the witnesses who were employed on the flour boats, and who assisted in landing the injured boat, swear that immediately after the collision they attempted to carry out a line, which, it is in proof, was about two hundred yards in length, and which would not reach the shore.

The remark is proper here that the witnesses for the libellants are in no case otherwise impeached than as they are contradicted by those of the respondent. No direct evidence is offered impugning their credit as persons deficient in character for truthfulness. They are before the court, therefore, with a just claim to credibility, unless the facts stated by them are contradicted by the testimony of more reliable witnesses. And, if credible, they clearly establish the position, that no fault is imputable to those in charge of the flour boat, and that the steamboat must be held responsible for the injury sustained by the collision. It is insisted, however, on the part of the respondent, that the evidence adduced by him relieves the steamboat from the charge of negligence or misconduct, and that the fault is wholly on the other side. A number of witnesses have been examined by the respondent

to sustain this view. They consist of the master of the steamer, one of the mates, an engineer and his assistant, together with some of the deck-hands, and several persons who were at the wood-yard when the steamboat landed and at the time of the collision. I shall not attempt critically to examine the statements of these witnesses. They coincide in saying that after the steamboat took the wood-flats in tow, and up to the time of the collision, there had been no forward motion of the boat; and that at that time the boat was lying with its stern near, or on the shore, and the bow quartering up stream, and not more than thirty yards from shore; and, that while in this position and kept there by the reversed action of the starboard and the forward action of the larboard engines, the flour boat being out of its place, and much too near the Kentucky shore, came against the steamer and thus sustained injury. It is further insisted, and there is the evidence of several of the respondent's witnesses to establish the fact, that the gunnel of the inner wood-boat attached to the steamer was entangled with a tree standing in the river near the shore in such a way as to prevent it from being moved upward, and that being aground at the stern, or very near the shore, there was no possibility of backing so as to avoid the descending flour boat. If this view is to be sustained, it follows that the flour boat was within thirty yards of the Kentucky shore, and also that the steamer was in a position rendering it impossible to get out of the way of the flour boat, and can not, therefore, be held responsible for the injury which resulted.

The sanction of the view thus urged by the respondent necessarily involves the repudiation of the testimony of nearly all the witnesses for the libellants. Considering the number of these witnesses, their opportunities of seeing the transactions of which they testify, and the clear and explicit statements they make, in relation to the main facts of the case, in the absence of any extrinsic evidence impairing their claim to credit, I do not see on what ground I can arbitrarily set them aside as unworthy of belief. To suppose that such a number of persons, without any apparent motive, could willfully have falsified the truth, is a conclusion which I should most reluctantly adopt. Nor do I think, that in crediting their statements, it follows, necessarily, that the witnesses for the respondent have testified corruptly. It seems to me that the apparent discrepancy between the witnesses for these parties, may, to a great extent, be explained and reconciled by the very reasonable assumption that the witnesses for the respondent, in their statements as to the movements of the steamer, its position and distance from the shore at the time the collision is supposed to have occurred, had reference to a state of things existing but a few minutes prior to that occurrence. It is doubtless true that the steamer, when the wood-boats were first taken in tow, was very nearly in the situation the witnesses describe. Its stern was probably on or very near the shore, and its bow thirty or forty yards, or less, out from the shore, and there was a forward and a backward action of the engines to enable it to maintain that position. But is it not reasonable to suppose these witnesses are under a mistake in saying—as some of them do—that there was not afterward a forward motion by both engines, which carried the boat outward into the stream, till it was two hundred yards from the shore, and had attained the position and place described by the libellants' witnesses, at the time the collision took place? It would require but two or three minutes to produce this state of things; and it might readily happen that the witnesses, not considering what change of position might take place in so brief a space, have stated the impressions made on their minds from facts observed at a prior time. I adopt this conclusion as reasonable, and as tending to harmonize the evidence and avoid the otherwise inevitable conclusion that some of the witnesses have corruptly stated that which is untrue. There is one fact, which, in my judgment, greatly strengthens the inference that the witnesses for the libellant are correct in saying the steamer was under headway, when the collision happened, and that those for the respondent, who testify that it had no forward motion then, are mistaken. I refer to the great force with which the flour boat was stricken. The result of the collision on the flat-boat has been stated. It seems improbable that such an injury could have been inflicted, upon any other supposition than that the steamboat had a· forward motion at the time. The mere force of the current, carrying the flour boat against the corner of the wood-boat, while at rest, is not sufficient to account for the injury sustained by the former. But, without pursuing this investigation further, I have but little hesitancy in reaching a conclusion, from a careful consideration of the whole case, that the responsibility for the injury resulting from this collision must rest on the Crescent City.

I will now state briefly the principles on which the damages are to be estimated.

It appears that after a detention of four days at Sugar Creek bend, the injured boat was repaired, and the flour, with the exception of five barrels which were lost, was reshipped on the same boat and reached New Orleans about March 18, 1854. It was consigned for sale to the firm of Graham & Buckingham, commission merchants of that city; one of the members of which house testifies that the flour was badly damaged by water. Its value at New Orleans, if in good condition, at that time, would have been $6.75 per barrel. It was sold at public auction on the 22d of March, after due notice given, at an average of about four dollars the barrel. It is claimed by the libellants, that the difference between the price for which the flour sold and the market value of the article, if not damaged, adding thereto the charges and expenses at New

Orleans, furnish the rule for the assessment of the damages in this action. Adopting this rule as the basis of a decree, the damages amount to $3,231.50, for which, with interest from March 22, 1854, a decree is asked. On the subject of damages, in cases of collision, the supreme court, in the case of Smith v. Condry, 1 How. [42 U. S.] 28, say: "It has been repeatedly decided in cases of insurance that the insured can not recover for the loss of probable profits at the port of destination, and that the value of the goods at the place of shipment is the measure of compensation. There can be no good reason for establishing a different rule in cases of loss by collision. It is the actual damage sustained by the party at the time and place of the injury that is the measure of damages." In the case before the court, this rule can not apply, for the reason that there was no market for flour at Sugar creek, where this collision occurred. And it is obviously proper. therefore, to estimate the damages according to the peculiar circumstances of the case, having due regard to the spirit of the rule sanctioned by the supreme court. It is conceded, and such is the proof, that there is no market for flour below the place where the injury occurred short of New Orleans; and that Cincinnati, sixty miles above the place of collision, is one of the best markets in the West for flour generally, and especially for flour damaged by water, where it is always in demand and meets with ready sale, at a good price, for making starch and for other purposes. It is also in evidence that, at the time of this occurrence, there was but a slight difference in the market rates of flour at New Orleans and Cincinnati.

The inquiry arises, was it proper for the owners or supercargo of the flour which was injured by water, to reship it for New Orleans, the place of its original destination, to be conveyed there at the slow rate at which a flat-boat must necessarily descend the river? On this subject, the obvious rule of justice is, that the owner or supercargo should act in good faith, and with the prudence and discretion which would be expected of men in their ordinary transactions. Now, it would seem from the evidence, that while parts of this flour were in the water but a few hours, other parts of it were submerged some portion of three days. It could not be otherwise than that the injury to the flour was considerable. Some unsuccessful efforts were made to procure the transportation of the flour to New Orleans by steamboat. This mode of conveyance would have insured its conveyance to that city, in a few days from the occurrence of the accident; and such a shipment of it would, doubtless, have been proper, under the circumstances. But failing in this, the course dictated by prudence was its conveyance to Cincinnati, which would have insured its being in market within a short period of time. This was entirely practicable; for the evidence is, that boats were running daily between Louisville and Cincinnati. It appears, however, that no attempt was made, looking to this disposition of the flour. It is the testimony of witnesses, of great experience in the flour trade, that the injury to flour which has been wet is increased in proportion to the length of time it remains in that condition. In warm weather it soon becomes sour; in cold weather, this effect is not produced. It could not be otherwise than that the damage to this flour would be materially enhanced by the time occupied in getting it to New Orleans in a flat-boat. It was between three and four weeks in reaching that place, during the latter part at least of that time, embracing a part of the month of March, the weather was probably warm, and the liability to injury therefore greater.

In view of all the facts of this case, I have not been able to perceive that any principle of justice requires that the respondent should be accountable for the increased loss on the cargo, resulting from the obvious error committed in shipping the flour to New Orleans instead of Cincinnati. It is in evidence by experts on this subject, that the damage to flour which has been wet ranges from fifty cents a barrel to one-half the market value of the article, if uninjured. The extent of the damage depends something on the length of time it is exposed to the water, and the length of time it remains wet, before being used. The injury is greater or less, also. according to the construction and quality of the barrels. One witness states, that where flour has been under water but an hour, or something more, it will sell at a loss not exceeding one dollar on the barrel—and another witness states that the loss would not exceed fifty cents the barrel. These witnesses have reference to the Cincinnati market. As to this cargo, if the price for which the flour was sold at New Orleans is adopted as fixing the ratio of injury, it would be nearly two dollars and seventy-five cents the barrel. This is obviously greatly beyond the loss which would have accrued if it had been brought to Cincinnati and sold there. And the fact first stated clearly shows the impropriety of its shipment to New Orleans. The evidence affords no precise data, by which to estimate the loss that would have accrued. if the flour had been sent to Cincinnati for sale. It may be fairly assumed from the evidence, that it would not have been less than one dollar and fifty cents on the barrel. This estimate has not the certainty that is desirable, but it doubtless approximates the real loss that the libellants would have sustained, if the course indicated as proper had been followed in the disposal of the injured flour. If it were possible to attain greater certainty in this respect, by a reference to a commissioner, I would willingly make an order to that effect. But I do not see that this object can be effected by such a course.

In addition to the direct loss from the injury to the flour, the libellants claim, as a part of the loss resulting from the collision, the freight agreed to be paid, and which it appears was paid, to the owner and master of the

barge, for its conveyance to New Orleans. The price agreed on by the parties, and stated in the bill of lading, was sixty-two and a half cents the barrel. If the court is right in its conclusion, that the rule of damages in the case is the market value of the damaged flour at Cincinnati, it is clear the libellants are entitled to recover the freight paid to the place of destination. The evidence proves that after the collision the master of the barge repaired his craft, and after a detention of between three and four days, proceeded forward with the cargo on board. This he had an unquestionable right to do, under the circumstances of the case, and was, of course, entitled to full freight. If the owner had appeared at the place of the accident, and had demanded the possession of the cargo, there would have been no obligation on the freighter to have delivered it to him, without payment of full freight. The law on this point is stated to be: "After the shipment of the cargo on the voyage, the shippers have no right to demand it at any intermediate port, short of the port of destination, without payment of full freight for the voyage, whether the cargo arrive in a damaged or undamaged state." Fland. Shipp. 250. The reason of this is stated by the same writer to be, that unless the ship is so wholly disabled as to be incapable of carrying the cargo to the place of its destination, the master has a right to insist upon the contract, and to a full opportunity of earning the freight agreed to be paid. In this view, the libellants derived no benefit from the delivery of the damaged flour at New Orleans, and are the actual losers of the amount of freight paid to that place. This loss is, therefore, to be regarded as resulting from the collision, and constitutes a proper item in estimating the damages for which the owners of the steamboat are responsible.

A decree will, therefore, be entered for the libellants, on the basis of a loss of one dollar and fifty cents on the 1,205 barrels of damaged flour, delivered at New Orleans, to which will be added the value of five barrels which were lost at the time of the accident, to be estimated at six dollars and seventy-five cents the barrel; and also the freight paid by the libellants, being sixty-two and a half cents the barrel, on the entire cargo.